IN THE UNITED STATES DISTRICT COURT
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| **FAUSTINO GONZALEZ-OYARZUN,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL NO. 14-1101 (GAG)** |
| **CARIBBEAN CITY BUILDERS, INC., et al.,** | |
| **Defendants.** | |

*"In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."*
U.S. CONST. amend. VII.

This right applies within the states, commonwealths, and territories of the United States.

## OPINION AND ORDER

Faustino Gonzalez-Oyarzun ("Plaintiff") sued Caribbean City Buildings, Inc. ("Caribbean"), Me Salve, Inc. ("Me Salve"), GIB Development, LLC ("GIB"), John Doe, and Insurance Company X (collectively "Defendants") for age discrimination and retaliation under both federal and Puerto Rico law.  (See Docket No. 1.)  After various motions and orders, the court allowed Plaintiff to amend the complaint to include a right to sue letter he received from the Equal Employment Opportunity Commission ("EEOC").  (See Docket No. 32.)  On March

Civil No. 14-1101 (GAG)

1    26, 2014, Plaintiff timely submitted an amended complaint in which he requested a jury trial and

2    which Defendants moved to dismiss for several reasons, including inclusion of a forum-selection

3    clause in a termination agreement ("termination agreement" or "agreement") directing the parties

4    to the San Juan Court of First Instance.  (See Docket Nos. 34 & 36.)  Plaintiff opposed the

5    motion and Defendants replied.  (See Docket Nos. 38 & 41.)

6        On May 1, 2014, the court ordered both parties to provide supplemental briefing as to

7    one of the issues Plaintiff raised in his opposition to the motion to dismiss: whether the Seventh

8    Amendment right to a civil jury trial has been incorporated within the states, commonwealths,

9    and territories of the United States.  (Docket No. 44.)  The court also ordered the parties to serve

10   the Commonwealth of Puerto Rico ("Commonwealth") and Puerto Rico's Office of Courts

11   Administration ("Office of Courts Administration") with a copy of the complaint, the motion to

12   dismiss, and the court's order so as to join them as necessary parties.  (Id.)  Plaintiff informed the

13   court on May 7, 2014, that he properly served the Commonwealth and Office of Courts

14   Administration.  (See Docket No. 47.)  Plaintiff, Defendants, the Commonwealth, and the Office

15   of Courts Administration timely complied with the court's order for supplemental briefing.  (See

16   Docket Nos. 65, 67, 78, & 79.)

17       For the following reasons, the court **GRANTS** the motion to dismiss at Docket No. 36,

18   as the forum-selection clause is valid.  In so holding, the court answers whether and finds in the

19   affirmative that the Seventh Amendment has been incorporated within the states,

20   commonwealths, and territories of the United States.   This case is **DISMISSED without**

21   **prejudice**.

22   **I.      Standard of Review**

**Civil No. 14-1101 (GAG)**

1    "The general rules of pleading require a short and plain statement of the claim showing that

2    the pleader is entitled to relief." Gargano v. Liberty Intern. Underwriters, Inc., 572 F.3d 45, 48

3    (1st Cir. 2009) (citations omitted) (internal quotation marks omitted).  "This short and plain

4    statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon

5    which it rests.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

6        Under Rule 12(b)(6), a defendant may move to dismiss an action against him for failure

7    to state a claim upon which relief can be granted.  See FED. R. CIV. P. 12(b)(6).  To survive a

8    Rule 12(b)(6) motion, a complaint must contain sufficient factual matter "to state a claim to

9    relief that is plausible on its face." Twombly, 550 U.S. at 570.  The court must decide whether

10    the complaint alleges enough facts to "raise a right to relief above the speculative level." Id. at

11    555.  In so doing, the court accepts as true all well-pleaded facts and draws all reasonable

12    inferences in the plaintiff's favor.  Parker v. Hurley, 514 F.3d 87, 90 (1st Cir. 2008).  However,

13    "the tenet that a court must accept as true all of the allegations contained in a complaint is

14    inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Threadbare

15    recitals of the elements of a cause of action, supported by mere conclusory statements, do not

16    suffice." Id. (citing Twombly, 550 U.S. at 555).  "[W]here the well-pleaded facts do not permit

17    the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it

18    has not 'show[n]' -'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting FED. R.

19    CIV. P. 8(a)(2)).

20        A plaintiff need not allege sufficient facts to meet the evidentiary *prima facie* standard.

21    See generally Rodriguez-Reyes v. Molina-Rodriguez, 711 F.3d 49 (1st Cir. 2013).  *Prima facie*

22    elements "are part of the background against which a plausibility determination should be

Civil No. 14-1101 (GAG)

1   made." Id. at 54 (external citations omitted). "[T]he elements of a *prima facie* case may be used

2   as a prism to shed light upon the plausibility of the claim." Id. (emphasis added).

3   **II.       Factual and Procedural Background**

4         Plaintiff invokes federal question jurisdiction pursuant to the Age Discrimination in

5   Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, diversity jurisdiction pursuant to 28

6   U.S.C. § 1332, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367. (See Docket No. 34

7   at 1.) He lodges claims for violations of several Puerto Rico laws, including Law 100, 29 P.R.

8   LAWS ANN. tit. § 146 *et seq.*; Law 80, 29 P.R. LAWS ANN. tit. § 185(e), and; Law 115, 29 P.R.

9   LAWS ANN. tit. § 194. Plaintiff asserts he exhausted the necessary procedural and administrative

10   prerequisites. (Id. at 2.) Elaborating, Plaintiff claims:

11                   A charge of age discrimination was filed [with] the Puerto Rico
12                   Antidiscrimination Unit ("ADU") and the [EEOC] on March 15,
13                   2013. Said filing was done within the [statute of limitations] . . . .
14                   The ADEA differs from Title VII in allowing parties to file suit
15                   without a right to sue letter from the EEOC, as long as the
16                   charging party waited 60 days after the filing of the charge with
17                   the EEOC. The required 60 day[] waiting period was satisfied in
18                   this case. The original charge was subsequently amended to raise
19                   a claim for retaliation under the ADEA and Puerto Rico law. The
20                   amended fil[ing includes] a retaliation claim [that] is like or
21                   reasonably related to the original charge and did not require
22                   exhaustion of administrative remedies. The 60 day[] waiting
23                   period as to this amend[ment] shall [expire] on March 29, 2014 . . .
24                   [and a] right to sue letter was issued by the EEOC on March 19,
25                   2014 . . . .
26   (Id.)

27         Plaintiff was born on December 19, 1946, making him 67 years old at the time he filed

28   the amended complaint. (Id. at 3.) Defendants share common ownership and work in an

29   integrated fashion, and they exercised sufficient control over the terms and conditions of

30   Plaintiff's employment to constitute a joint and/or single employer. (Id.) Plaintiff began

4

Civil No. 14-1101 (GAG)

1    working for them on February 5, 2007, as the administrator in charge of handling their real estate

2    properties.   He was terminated on September 25, 2012, at the age of 65.   (Id.)   Defendants

3    neglected to state a reason for terminating Plaintiff even though his job performance was

4    excellent and he was never disciplined. (Docket No. 32 at 3.)  To replace Plaintiff, Defendants

5    hired Pilar González and Ana Pabón.   (Id. at 4.)   They were hired weeks before Plaintiff's

6    termination and are in their late thirties or early forties.  (Id.)

7            Plaintiff entered into a termination agreement with Caribbean when he was released,

8    waiving certain potential causes of action.   (Id.)   He claims the waiver is invalid for several

9    reasons: (1) failure to comply with the Older Workers Benefit Protection Act ("OWBPA"), 29

10   U.S.C. § 626(f); (2) failure to provide adequate consideration for the waivers and releases

11   obtained; (3) improper interference with investigative duties and functions of federal and local

12   administrative agencies dealing with discrimination in employment, and; (4) inclusion of

13   waivers that never received prior necessary approval from regulatory overseers.

14           Plaintiff also asserts he suffered retaliation because Defendants filed a claim for breach

15   of contract in Puerto Rico court, invoking the termination agreement, seeking to prevent him

16   from pursuing administrative remedies.   (Id. at 5.)   Defendants filed the claim in the Court of

17   First Instance, San Juan Division, pursuant to a forum-selection clause in the agreement that

18   vests in that court "sole and exclusive jurisdiction and venue for any controversy arising in

19   relation to this Agreement."  (Docket No. 16-1 at 10.)

20   **III.    Discussion**

21           Defendants moved to dismiss on several grounds: (1) failure to exhaust administrative

22   remedies; (2) Colorado River abstention; (3) waiver and release of causes of action under Puerto

5

**Civil No. 14-1101 (GAG)**

1   Rico law; (4) lack of supplemental jurisdiction over state law claims; (5) failure to establish a

2   *prima facie* case of retaliation, and; (6) *forum non conveniens*.  Because the court bypasses the

3   questions of jurisdiction due to a valid forum-selection clause and dismisses the case for *forum*

4   *non conveniens*,[1] it does not reach any meaningful conclusion as to the first five contentions but

5   briefly discusses them and the questions of jurisdiction in a footnote.[2]

---

[1] "[C]ourts should evaluate a forum-selection clause pointing to a nonfederal forum in the same way that they evaluate a forum-selection clause pointing to a federal forum." Atl. Marine v. U.S. Dist. Ct. W. Dist. of Tex., 134 S. Ct. 568 (2013) (slip op. at 10) (citations and quotation marks omitted).  "When the parties have agreed to a valid forum-selection clause, a district court should ordinarily [dismiss] the case [without prejudice, destining it for] the forum specified in that clause.  Only under extraordinary circumstances unrelated to the convenience of the parties should a [*forum non conveniens*] motion be denied." Id. (slip op. at 11).  "The enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system . . . . and should be given controlling weight in all but the most exceptional cases." Id. (slip op. at 12) (citations, brackets, and quotation marks omitted).

[2] The court is aware of the importance of constitutional avoidance and reaching the jurisdictional question if possible in lieu of dismissal for *forum non conveniens*.  Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 436 (2007).  To be sure, the court has investigated the pendent issues and determined that it does have jurisdiction and it likely could not dismiss this case as a matter of law, though it does not formally or substantially address them because it dismisses this case for *forum non conveniens*.  Id. at 430 ("*Forum non conveniens* involves a deliberate abstention from the exercise of jurisdiction.").

   Normally, parties must exhaust administrative remedies under the ADEA before filing a case in federal court.  However, because the court bypasses the questions of jurisdiction, it does not reach the issue of whether Plaintiff exhausted administrative remedies.  See Kale v. Combined Ins. Co., 861 F.2d 746, 751-52 (1st Cir. 1988) (administrative remedy exhaustion scheme under the ADEA is nonjurisdictional and subject to equitable modification).  While it seems apparent from the right to sue letters and the March 2013 filing that remedies were exhausted, this issue is thus **MOOT.**

   Next, Defendants claim there is ongoing, parallel litigation in the Puerto Rico Court of First Instance, San Juan Division, Civil Case No. KAC 2013-0837 (908).  (Docket No. 36 at 18.)  They ask the court to exercise Colorado River abstention.  (Id.)  However, because the court dismisses this case for *forum non conveniens*, it does not reach the question of abstention.  Plaintiff also raised the lack of a civil jury trial right as justification for rejecting Defendants' abstention argument, so it would appear that the court would grapple with that question in completing Colorado River abstention assessment, as well.  (Docket No. 38 at 20-23.)  Whether

Civil No. 14-1101 (GAG)

_____

Plaintiff is required to counterclaim in the ongoing state litigation or is permitted to bring a separate claim in state court, furthermore, is a matter of Puerto Rico law.  Therefore, this issue is **MOOT**.

Defendants next argue that Plaintiff waived his right to bring these claims by signing the termination agreement, which contains clauses waiving the underlying claims, and ratifying it when he accepted $25,000 and never gave it back.  This is also for the Puerto Rico court to decide.  "[T]he merits of [a] contract termination controversy are to be resolved in the forum chosen by the parties."  Rafael Rodriguez Barril, Inc. v. Conbraco Indus., 619 F.3d 90, 95 (1st Cir. 2010).  Even if the court assessed whether "it lacks jurisdiction over the cause or the defendant" and should "dismiss on that ground," see Sinochem, 549 U.S. at 436, it would rule that it does not lack jurisdiction because a federal question has been presented and it is plausible that the waiver is invalid. The termination agreement does not seem to comply with 29 U.S.C. § 626(f)(1)(F)(i) or § 626(f)(1)(G) because Plaintiff was not given a period of 21 days to consider the agreement (he was given seven days) and the agreement does not expressly provide for seven days following its execution for revocation.  (See Docket No. 16-1.)  The court addresses these issues because of Sinochem's concern as well as the principle of constitutional avoidance only to ascertain that it likely would have jurisdiction and that there are no other valid grounds for dismissal, but the court does not formally broach these questions because doing so would deprive the parties of their selected destination of the San Juan Court of First Instance.  Furthermore, even if all federal and state claims were deemed invalidly waived, the forum-selection clause would survive or wilt under differing circumstances.  See generally Rafael Rodriguez Barril, Inc., 619 F.3d at 90-95.  This issue is **MOOT**.

Defendants also request the court to decline jurisdiction over the state law claims, referring to them as supplemental because they presume jurisdiction lies only in a federal question.  Because the court does not reach the jurisdictional questions, this issue is **MOOT**.

Lastly, Defendants claim Plaintiff cannot establish a *prima facie* retaliation case because the retaliation he alleges occurred after his employment ended; thus, he never suffered an adverse employment action.  (Docket No. 36 at 31.)  Satisfying *prima facie* elements may help a court deduce the plausibility of a claim, but relying on them as dispositive is premature because that is a matter for summary judgment.  Plaintiff counters that the post-employment acts constitute adverse employment actions, relying on Supreme Court and Fifth Circuit cases.  (Docket No. 38 at 25-26.)  Supreme Court cases speak to this issue, but, again, the Puerto Rico court is well-equipped to resolve this question, as the court bypasses the jurisdictional questions.  This issue is **MOOT**.

At bottom, the court has looked to each of these pendent issues in search of alternative grounds on which to dismiss this case in accordance with the principles of constitutional avoidance and those espoused in Sinochem.  The court cannot "readily determine that it lacks jurisdiction over the cause;" moreover, it also seems likely that jurisdiction exists.  549 U.S. at 436.  Furthermore, even if the court invalidated the clause as an "unusual" or "exceptional case" under Atlantic Marine or for violating The Bremen factors, it would still have to explain itself, which necessitates reaching the constitutional question.

Civil No. 14-1101 (GAG)

1        **1.    The Forum-Selection Clause**

2        Assessing forum-selection clauses under the doctrine of *forum non conveniens* is

3    appropriate when the clause sends litigants from federal court to state court; "defendants would

4    have sensible reasons to invoke . . . the *forum non conveniens* doctrine in addition to Rule

5    12(b)(6)."  See Atlantic Marine, 134 S. Ct. at 580 n.4.  Defendants moved for dismissal under

6    both.  (See Docket No. 36 at 4-11.)  Although the First Circuit assesses forum-selection clause-

7    based motions to dismiss under Rule 12(b)(6), see Silva v. Encyclopedia Britannica, 239 F.3d

8    385, 387 (1st Cir. 2001), the Supreme Court has clarified that a *forum non conveniens* motion is

9    also an appropriate vehicle for dismissing a case on forum-selection clause grounds.  Id.

10        The forum-selection clause in the termination agreement states: "The Court of First

11   Instance, San Juan Division shall have sole and exclusive jurisdiction and venue for any

12   controversy arising in relation to this Agreement."  (Docket No. 16-1 at 10.)  The forum-

13   selection clause is valid under Atlantic Marine and The Bremen, and this case is dismissed

14   without prejudice for *forum non conveniens*.  See generally Atl. Marine, 134 S. Ct. 568; see also

15   M/S Bremen v. Zapata Off-Shore Company, 407 U.S. 1 (1972).

16        Plaintiff roots his only argument for invalidating the clause in the well-known fact that

17   Puerto Rico does not afford its civil litigants jury trials, abridging his Seventh Amendment right.

18   See Ortega v. Star-Kist Foods, Inc., 370 F.3d 124, 126 (1st Cir. 2004), rev'd on other grounds,

19   Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546 (2005)).  The First Circuit has

20   considered this exact argument before and found that clauses directing litigants to the Puerto

21   Rico forum are valid jury trial waivers even though Puerto Rico does not provide for civil jury

22   trials.  See Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 23-24 (1st Cir. 2009).  The

8

Civil No. 14-1101 (GAG)

1   court follows <u>Rivera</u>'s holding and the principles of deference to a forum-selection clause in

2   <u>Atlantic Marine</u> by finding that it is valid, but the court also discusses developments in the law

3   clarifying that the Seventh Amendment right to a civil jury trial applies within the states,

4   commonwealths, and territories of the United States.[3]

5         Although "[r]esolving a *forum non conveniens* motion does not entail any assumption by

6   the court of substantive law-declaring power," the court must nonetheless assess this claim under

7   governing *forum non conveniens* doctrine, i.e., whether the claim should be dismissed without

8   prejudice because of a forum-selection clause.  <u>See</u> <u>Atl. Marine</u>, 134 S. Ct. 568.  In performing

9   this analysis, the court runs head-on into the question of whether the right to a civil jury trial is a

10  fundamental liberty interest.  <u>The Bremen</u> directs courts to assess whether enforcement of the

11  clause would be unreasonable and unjust or whether it violates strong federal public policy.  407

---

[3] Even if the court held that the clause violates <u>The Bremen</u> factors (which it does because <u>Rivera</u> relied on <u>Bombolis</u> and <u>Bombolis</u>'s impact is at issue here, but the court cannot effectively overturn a higher court's decision without clearer indication that it is acceptable to do so, such as that discussed in <u>McDonald</u>), the court would still be faced with the constitutional question in holding that the clause is invalid for directing the parties to a forum that denies its litigants civil jury trials.  Regardless, the court hesitates to issue a ruling supporting invalidation of all forum-selection clauses directing litigants to Puerto Rico.  Although litigants are entitled to the right to civil jury trials, the parties selected the forum by private agreement; furthermore, actual denial of the right is not a ripe question before the court.  The question is merely whether a forum-selection clause is invalid because it sends litigants to a forum in which they do not have the right to a civil jury trial.  The court's holding makes clear that those litigants do have the right.  The Office of Courts Administration has made it clear that, while it would require planning and adjustments, it "does not express an opinion with regard to whether it is good or bad that in Puerto Rico there be trials by jury in civil cases."  (<u>See</u> Docket No. 78-1 at 2.)  The clause thus need not be disturbed.  While the court's ruling today means that, barring waiver, each civil litigant who appears in a Puerto Rico trial court has the right to a civil jury trial, invalidating the clause because Plaintiff may not receive a jury trial should his case proceed that far is outside the call of the question.

**Civil No. 14-1101 (GAG)**

1    U.S. 1, 15 (1972).  Surely a fundamental liberty interest falls within the latter, the deprivation of

2    which offends the former.

3           As discussed more fully herein, Plaintiff has a right to a civil jury trial that he did not

4    tacitly waive because the agreement does not direct him to a forum in which he is not entitled to

5    a civil jury trial.  Whether Puerto Rico provides Plaintiff this right in practice if this case reaches

6    the trial stage is not before the court today.  See Capital Traction Co. v. Hof, 174 U.S. 1, 23

7    (1899) ("[I]t is not 'trial by jury,' but 'the right of a trial by jury,' which . . . 'shall be

8    preserved.'  [The Amendment] does not prescribe at what stage . . . a trial by jury must, if

9    demanded, be had; or what conditions may be imposed upon the demand of such trial.") (citation

10   omitted).

11                      **2.     The Role of the Civil Jury Trial in American History and Tradition as**
12                              **Fundamental to our Scheme of Ordered Liberty**[4]
13
14                      [T]he trial by jury ever has been, and I trust ever will be looked
15                      upon as the glory of the English law . . . . It is the most
16                      transcendent privilege which any subject can enjoy, or wish for,
17                      that he cannot be affected either in his property, his  liberty, or his
18                      person, but by the unanimous consent of twelve of his neighbours
19                      and equals.
20
21   3 William Blackstone, COMMENTARIES *379, quoted in, Reid v. Covert, 354 U.S. 1, 9-10
22
23   (1956).
24
25           The court breaks no new ground in discussing the historical significance of the Seventh

26   Amendment and its place in Supreme Court jurisprudence.   Justice Rehnquist's dissent in

---

[4] The *William and Mary Law Review* was extremely helpful  in providing the sources it procured when editing the citations of an article published in its March 2014 edition.   See Sheldon Whitehouse, The Civil Jury as a Political Institution Symposium: Restoring the Civil Jury's Role in the Structure of our Government, 55 WM. & MARY L. REV 1241 (Mar. 2014).

**Civil No. 14-1101 (GAG)**

1   <u>Parklane Hosiery v. Shore</u>, 439 U.S. 322 (1979), summarizes the Supreme Court's perspectives

2   on the Amendment and its place in American history:  "The right of trial by jury in civil cases at

3   common law is fundamental to our history and jurisprudence" and has been well-documented by

4   the Court.  439 U.S. at 338-39 (Rehnquist, J., dissenting).[5]

5        In embarking on an explanation of the Amendment's importance, Justice Rehnquist

6   began: "It is perhaps easy to forget, now more than 200 years removed from the events, that the

7   right of trial by jury was held in such esteem by the colonists that its deprivation at the hands of

8   the English was one of the important grievances leading to the break with England."  <u>Id.</u> at 340

9   (citation omitted).  He continued by noting the universality of the civil jury right at the time of

10  the Declaration of Independence: "[A]fter the war had broken out, all of the 13 newly formed

11  States restored the institution of civil jury trial to its prior prominence; 10 expressly guaranteed

12  the right in their state constitutions and the 3 others recognized it by statute or by common

13  practice."  <u>Id.</u> at 340 & n.4 (citing state constitutions, statutes, and substantiating sources).  The

14  Judiciary Act of September 24, 1789, which was passed before the Bill of Rights was proposed

15  to the state legislatures, provided for a civil jury trial right.  <u>See id.</u> at 343 n.9.  "The founders of

16  our Nation considered the right of trial by jury in civil cases an important bulwark against

17  tyranny and corruption, a safeguard too precious to be left to the whim . . . of the judiciary,"

18  Justice Rehnquist wrote; it was not a right meant to establish "more efficient judicial

19  administration."  <u>Parklane Hosiery</u>, at 343-44.

20        Various historically significant figures in the American and English legal systems

_____

[5] Justice Rehnquist cited, <u>inter alia</u>, <u>Colgrove v. Battin</u>, 413 U.S. 143 (1979); <u>Hof</u>, 174 U.S. 1; <u>Parsons v. Bedford</u>, 3 Pet. 433 (1830).  <u>See</u> <u>Parklane Hosiery</u>, 439 U.S. at 339 n.2.

**Civil No. 14-1101 (GAG)**

1    supported Justice Rehnquist's conclusion. For example, Blackstone wrote:

2            For the most powerful individual in the state will be
3            cautious of committing any flagrant invasion of
4            another's right, when he knows that the fact of his
5            oppression must be examined and decided by twelve
6            indifferent men, not appointed till the hour of trial; and
7            that, when once the fact is ascertained, the law must of
8            course redress it.  This therefore preserves in the hands
9            of the people that share which they ought to have in
10           the administration of public justice, and prevents the
11           encroachments of the more powerful and wealthy
12           citizens.

13

14   3 William Blackstone, COMMENTARIES *380.  Likewise, the Stamp Act Congress of 1765,

15   which included the likes of John Dickinson, Robert Livingston, Thomas McKean,  James

16   Otis, Caesar Rodney, and John Rutledge, stated that "trial by jury is the inherent and

17   invaluable right of every British subject in these colonies."  RESOLUTIONS OF THE STAMP

18   ACT CONGRESS 1765, ¶ 7, available at http://avalon.law.yale.edu/18thcentury/resolu65.asp

19   (last accessed June 27, 2014).   And, under George Washington's authority, Rutledge,

20   William Livingston of New Jersey, Benjamin Franklin, John Jay, and Thomas Johnson of

21   Maryland drafted the Declaration of the Causes and Necessity of Taking up Arms on July 6,

22   1775, in which they lamented the deprivation of "the accustomed and inestimable privilege

23   of trial by jury, in cases affecting both life and property," a statement that acknowledges the

24   importance of both criminal *and* civil jury trials.  DECLARATION OF THE CAUSES AND

25   NECESSITY OF TAKING UP ARMS (1775), reprinted in SELECT CHARTERS AND OTHER

26   DOCUMENTS ILLUSTRATIVE OF AMERICAN HISTORY 1606-1775, at 374, 376 (William

27   MacDonald ed., 1906). A year later, Jefferson penned that King George stripped the

28   colonies, "in many cases, of the benefits of trial by jury."  DECLARATION OF INDEPENDENCE

**Civil No. 14-1101 (GAG)**

1    (1776).

2         Several prominent leaders such as James Wilson, eventual Supreme Court Justice

3    James Iredell, Alexander Hamilton, and James Madison all voiced their support for civil

4    jury trials, with Hamilton alone among them asserting that civil jury trials did not constitute

5    a fundamental liberty interest.  Id. at 1250-52 (citing various primary sources).  Madison, for

6    his part, argued that "[t]rial by jury . . . is as essential to secure the liberty of the people as

7    any one of the pre-existent rights of nature."  Id. (citation omitted).  Similarly, in 1789,

8    Jefferson wrote to Thomas Paine: "I consider [trial by jury] as the only anchor ever yet

9    imagined by man, by which a government can be held to the principles of its constitution."

10   LETTER FROM THOMAS JEFFERSON TO THOMAS PAINE (July 11, 1789), reprinted in 7 THE

11   WRITINGS OF THOMAS JEFFERSON 408 (Andrew A. Lipscomb & Albert E. Beigh eds., 1903).

12        This wealth of historical evidence compelled Seventh Amendment scholar Suja A.

13   Thomas to posit that the Seventh Amendment civil jury trial right has been incorporated

14   because "[e]vidence at the time of the founding through the adoption of the Fourteenth

15   Amendment demonstrates that the Seventh Amendment was a fundamental right and thus

16   was incorporated against the states under the due process clause of the Fourteenth

17   Amendment."  Nonincorporation: the Bill of Rights After McDonald v. Chicago, 88 NOTRE

18   DAME L. REV. 169, 194 (November 2012).  Echoing Rehnquist's acknowledgement of the

19   right's universality at the time of the founding, she notes that "[t]he issue . . . was not

20   whether there should be a civil jury trial right in the states but the extent of the jury trial

21   right given the differences among the states."  Id. at 192 (citation omitted).  The court

22   agrees.

13

**Civil No. 14-1101 (GAG)**

1      Hamilton believed the right to a civil jury trial fell short of a liberty interest, <u>see</u>

2   <u>Nonincorporation: the Bill of Rights After McDonald v. Chicago</u>, 88 NOTRE DAME L. REV.

3   at 192 (citing substantiating sources), but the prevailing view was that the right to *some form*

4   of a civil jury trial was fundamental to ordered liberty, and Hamilton acknowledged this but

5   that the states could not agree on the *specific parameters* by which to implement it.  <u>See,</u>

6   <u>e.g.</u>, THE FEDERALIST NO. 83, at 419 (Alexander Hamilton) (Ian Shapiro ed., Yale Univ.

7   Press 2009) ("[The right to a civil jury trial] would be entitled to a constitutional provision

8   in its favor if it were possible to fix the limits within which it ought to be comprehended . . .

9   .").  The text of the Amendment itself states as much: the right to a civil jury trial was

10  "preserved," not created.  U.S. CONST. amend. VII; <u>see also</u> <u>Baltimore & Carolina Line v.</u>

11  <u>Redman</u>, 295 U.S. 654, 657 (1935) ("[The] right of trial by jury thus preserved is the right

12  which existed under the English common law when the Amendment was adopted.").

13      "One might justly wonder then why no mention of the right of trial in civil cases

14  should have found its way into the Constitution," wrote Justice Rehnquist in <u>Parklane</u>

15  <u>Hosiery</u>, 439 U.S. at 341.  "The omission of a clause protective of the civil jury trial right

16  was not for lack of trying, however.  Messrs. Pinckney and Gerry proposed to provide a

17  clause securing the right of jury trial in civil cases, but their efforts failed."  <u>Id.</u> (citing

18  records from Constitutional Convention).  "Several reasons have been advanced for this

19  failure.  The Federalists argued that the practice of civil juries among the several States

20  varied so much that it was too difficult to draft constitutional language to accommodate the

21  different state practices," and that the Convention members simply wanted to go home

22  before reaching the question.  <u>Id.</u> at 342 & n.7.

**Civil No. 14-1101 (GAG)**

1    Nonetheless, one of "the best examples" of the "clauses of the Constitution which

2  guarantee[s] and safeguard[s] the fundamental rights and liberties of the individual [is] the

3  Seventh Amendment[], which guarantee[s] the right of trial by jury."  <u>Continental Ill. Nat'l</u>

4  <u>Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co.</u>, 294 U.S. 648, 669 (1935).

5  "[T]he Bill of Rights codified venerable, widely understood liberties."  <u>District of Columbia</u>

6  <u>v. Heller</u>, 554 U.S. 570, 605 (2008).  The discussion of the civil jury trial's importance in

7  American history elucidates its paramount importance.  The basic right to a civil jury trial is

8  a fundamental liberty interest.

9              **3.      Incorporating the Seventh Amendment**

10    The Seventh Amendment applies within the states, commonwealths, and territories

11  of the United States.

12                  a.      <u>McDonald and Rivera</u>

13    In <u>Rivera</u>, the First Circuit considered a challenge to the validity of a forum-selection

14  clause not much different from the one the court considers here.  The plaintiff argued that the

15  clause was invalid because he had not expressly waived the right to a jury trial and Puerto Rico

16  fails to provide its litigants with civil jury trials.  <u>See</u> <u>Rivera</u>, 575 F.3d at 23-24.  The First

17  Circuit rejected the argument, relying only on <u>Bombolis</u> for the proposition that the Seventh

18  Amendment has not been incorporated within the states, commonwealths, and territories of the

19  United States.  <u>Minneapolis & St. Louis R. Co. v. Bombolis</u>, 241 U.S. 211 (1916)) (Seventh

20  Amendment not incorporated within the states).Choosing to litigate in the Puerto Rico courts,

**Civil No. 14-1101 (GAG)**

1   where no jury trial right exists, implied acceptable waiver of the right.  Id. (citing Bombolis, 241

2   U.S. 211).[6]

3       McDonald v. Chicago, 561 U.S. 742 130 S. Ct. 3020 (2010), decided after Rivera,

4   clarified the scope of selective incorporation doctrine.  Although the court reads McDonald as

5   opening the door to selective incorporation of the Seventh Amendment in contrast to Bombolis,

6   it does not invalidate forum-selection clauses directing litigants to the Puerto Rico forum as

7   Rivera prohibits; rather, it reads McDonald to clarify that the Seventh Amendment applies

8   within the states, commonwealths, and territories of the United States.  McDonald, 561 U.S.

9   742, 130 S. Ct. 3020 (2010) (citations only of Supreme Court Reporter hereinafter).

10      The McDonald Court found the Second Amendment incorporated within the states.

11   While the Court disagreed about the appropriate clause through which to do so, five justices

12   agreed that the right it protected was fundamental to ordered liberty. Id. at 3028-31.

---

[6] Courts routinely enforce clauses selecting foreign fora where no jury right exists. See, e.g., Interamerican Trade Corp. v. Companhia Fabricadora de Pecas, 973 F.2d 487 (6th Cir. 1992); see also Rivera, 575 F.3d at 24 (taking note of this fact). In the context of international trade and commerce, such decisions make a great deal of sense. See Bremen, 407 U.S. at 9 ("The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts."). But where, as here, the clause concerns only domestic fora---and thus "our laws and . . . our courts"---such "parochial" concerns are without force. As explained below, the court's concern here is whether fundamental rights, rooted in this nation's history and tradition, are respected for *all* American citizens, in *all* American jurisdictions. See El Vocero de P.R. v. Puerto Rico, 508 U.S. 147, 150-51 (1993) (holding that Puerto Rico's traditions cannot substitute for general principles of constitutional law); see also Boumediene v. Bush, 553 U.S. 723, 758 (2008) (citing Torres v. Puerto Rico, 442 U.S. 465, 475-76 (1979) (Brennan, J., concurring) ("Whatever the validity of the [Insular Cases] in the particular historical context in which they were decided, those cases are clearly not authority for questioning the application of . . . any provision of the Bill of Rights . . . to the Commonwealth of Puerto Rico . . . .")); Consejo de Salud Playa de Ponce v. Rullan, 586 F. Supp. 2d 22, 43 (D.P.R. 2008) (explaining that there is no justification for "treating Puerto Rico as an unincorporated territory of dissimilar traditions and institutions, when the Constitutional reality is otherwise").

**Civil No. 14-1101 (GAG)**

1   Furthermore, the Court declined to reconsider the holding in the <u>Slaughterhouse Cases</u>.  <u>Id.</u>

2   Therefore, the court engages in incorporation analysis under the auspices of the Due Process

3   Clause,[7] as did the <u>McDonald</u> plurality.  <u>Id.</u>

4       The Supreme Court has never explicitly "embraced [the] 'total incorporation' theory,"

5   which provides that that the entire Bill of Rights has been incorporated. <u>See</u> 130 S. Ct. at 3033

6   n.10.   Nonetheless, <u>McDonald</u> acknowledged that the Court has "moved in that direction by

7   initiating what has been called a process of 'selective incorporation,' i.e., the Court began to hold

8   that the Due Process Clause fully incorporates particular rights contained in the first Eight

9   Amendments." <u>Id.</u> at 3034 (citations omitted).  The <u>McDonald</u> Court clarified that the governing

10   standard is not whether any civilized system can be imagined that would not accord the

11   particular protection.   <u>Id.</u>   "Instead, the Court inquired whether a particular Bill of Rights

12   guarantee is fundamental to *our* scheme of ordered liberty and system of justice."  <u>Id.</u> (citations

13   omitted) (emphasis in original).

14       In recent years, the Court has "shed any reluctance to hold that rights guaranteed by the

15   Bill of Rights met the requirements for protection under the Due Process Clause." <u>Id.</u> at 3034-35.

16   With such reluctance behind it, the Court has "incorporated almost all of the provisions of the

17   Bill of Rights," and "[o]nly a handful" of rights remain unincorporated.  <u>Id.</u> at 3034-35 (citation

18   omitted).  It is in this context that <u>McDonald</u> specifically addressed the right to a civil jury trial:

19   "Our governing decisions regarding the . . . Seventh Amendment's civil jury trial requirement

20   long predate the era of selective incorporation."  <u>Id.</u> at 3035 n.13.

---

[7] The court does not assess this matter under the Privileges or Immunities Clause, under which the states are not bound to provide civil jury trials.  <u>See</u> <u>Walker v. Sauvinet</u>, 92 U.S. 90, 92-93 (1876).

**Civil No. 14-1101 (GAG)**

1    Given the <u>McDonald</u> Court's characterization of those precedents, this is no small

2    statement.   As the Court observed, it had "abandoned 'the notion that the Fourteenth

3    Amendment applies to the States only a watered-down, subjective version of the individual

4    guarantees of the Bill of Rights,' stating that it would be 'incongruous' to apply different

5    standards 'depending on whether the claim was asserted in a state or federal court.'" <u>Id.</u> at 3035

6    (citation omitted).   "Instead, the Court decisively held that incorporated Bill of Rights

7    protections 'are all to be enforced against the States under the Fourteenth Amendment according

8    to the same standards that protect those personal rights against federal encroachment.'" <u>Id.</u>

9    (citations omitted) (citing cases).[8]

10   Determining whether the right to a civil jury trial is fundamental to our scheme of

11   ordered liberty and thus incorporated requires ascertaining whether the right is "deeply

12   rooted in this Nation's history and tradition."   <u>Id.</u> at 3036 (quoting <u>Washington v.</u>

13   <u>Glucksberg</u>, 521 U.S. 702, 721 (1997)).   The court has no doubt that the right's historical

14   significance, discussed above, necessitates a finding that it constitutes a fundamental liberty

15   interest rooted in our Nation's history and tradition.

16                              b.      <u>The Scope and Impact of Incorporation</u>

17   A closer question lies in the historical necessity of incorporating the *entirety* of the

18   Seventh Amendment.   The clause requiring civil jury trials for suits at common law

---

[8] The Court also noted the exception that the Sixth Amendment right to a unanimous jury is not identical at the state level, classifying this holding as an unusual division among the Justices and not an endorsement of a two-track approach to incorporation.  <u>McDonald</u>, 130 S. Ct. at 3035 n.14.

**Civil No. 14-1101 (GAG)**

1    "exceeding twenty dollars" would be mandatory at the state level.  U.S. CONST. amend. VII.

2    The states wanted to maintain flexibility in administering the right and remain unrestrained

3    by amount-in-controversy limitations.     Complete incorporation might preclude that

4    flexibility.   "The aim of the Amendment," however, "is to preserve the substance of the

5    common-law right of trial by jury, as distinguished from mere matters of form or procedure,

6    and particularly to retain the common-law distinction between the province of the court and

7    that of the jury . . . ."  Redman, 295 U.S. at 657.

8         Furthermore, as the McDonald plurality noted, "if a Bill of Rights guarantee is

9    fundamental from an American perspective, then, unless *stare decisis* counsels otherwise,

10   that guarantee is fully binding on the States and thus *limits* (but by no means eliminates)

11   their ability to devise solutions to social problems that suit local needs and values."  130 S.

12   Ct. at 3046 (emphasis in original).  Indeed, Bill of Rights guarantees do not allow everyone,

13   everywhere, to exercise such rights without restriction whenever they wish.   See, e.g.,

14   Heller, 554 U.S. at 595 ("Thus, we do not read the Second Amendment to protect the right

15   of citizens to carry arms for *any sort* of confrontation, just as we do not read the First

16   Amendment to protect the right of citizens to speak for *any purpose*.") (emphasis in

17   original).  Similarly, there are limitations to civil jury trials.  See e.g., FED. R. CIV. P. 38(e)

18   (no civil jury trial for admiralty or maritime claims); see also 28 U.S.C. § 2402 & 32 C.F.R.

19   § 750.32(b) (no civil jury trial for claims against the sovereign); Curtis v. Loehner, 415 U.S.

20   189, 194-95 (1974) (discussing laws providing no civil jury trial rights in administrative

21   hearings or certain bankruptcy proceedings).

**Civil No. 14-1101 (GAG)**

1      It is safe to say, however, that constitutional and statutory claims for compensatory

2  and punitive damages fall under the Amendment's umbrella.  See, e.g., Curtis, 415 U.S. at

3  194 ("The Seventh Amendment does apply to actions enforcing statutory rights, and

4  requires a jury trial upon demand, if the statute creates legal rights and remedies,

5  enforceable in an action for damages in the ordinary courts of law.").  "The Amendment did

6  not bind the federal court to the exact procedural incidents or details of jury trial according

7  to the common law in 1791, any more than it tied them to the common-law system of

8  pleading or the specific rules of evidence then prevailing."  Galloway v. United States, 319

9  U.S. 372, 390-91 (1943).  The conclusion which "both history and the previous decisions [of

10  the Supreme Court] support," wrote the Galloway Court, "is that the Amendment was

11  designed to preserve the basic institution of jury trial in only its most fundamental elements,

12  not the great mass of procedural forms and details, varying even then so widely among

13  common-law jurisdictions."  Id. at 392.

14      For instance, the Curtis Court noted that it "need not, and d[id] not, go so far as to

15  say that any award of monetary relief must necessarily be 'legal' relief," and proceeded to

16  discuss, but take no view on, how some appellate courts have held that claimants for

17  reinstatement and backpay are not entitled to civil jury trials because such claims are rooted

18  in equity.  415 U.S. at 196 (citations omitted).  When a legislature has created an action

19  unheard of at common law, furthermore, the Seventh Amendment requires a trial by jury

20  only if that action involves rights and remedies "of the sort traditionally enforced in an

21  action at law."  FDIC v. New London Enters., Ltd., 619 F.2d 1099, 1102 (5th Cir. 1980)

**Civil No. 14-1101 (GAG)**

1   (citing <u>Pernell v. Southall Realty</u>, 416 U.S. 363 (1974)).   Those issues which were not

2   afforded a civil jury trial in 1791, such as maritime and admiralty claims, claims against the

3   sovereign, and actions rooted in equity and family law, likely do not require one today.

4        The efficiency and utility of small claims proceedings nationally would seem to be

5   jeopardized by this holding because of the Seventh Amendment's Twenty Dollar Clause and

6   the general rule that Bill of Rights guarantees apply with equal force at the state level.   <u>See</u>

7   <u>McDonald</u>, 130 S. Ct. at 3046 (citing <u>Cheung v. Eighth Judicial Dist. Court</u>, 121 Nev. 867,

8   124 P.3d 550 (2005)) ("As a result of <u>Bombolis</u>, cases that would otherwise fall within the

9   Seventh Amendment are now tried without a jury in state small claims courts.").   But

10  <u>Cheung</u>'s take on the Seventh Amendment's application to small claims courts applies only

11  to Nevada and even states that "*contrary to many other states*, Nevada did not historically

12  distinguish small claims actions by requiring that they be adjudicated in juryless

13  proceedings."   121 Nev. at 884, 124 P.3d at 563 (emphasis ours).   <u>Bombolis</u> did not

14  effectively exempt small claims courts from the duty to provide for civil juries; rather, small

15  claims, in historical fact, were not "[s]uits at common law" subject to civil jury trials.   <u>See</u>

16  U.S. CONST. amend. VII; <u>see also</u> <u>Hof</u>, 174 U.S. at 18.   Therefore, the court's ruling has no

17  impact on small claims courts that do not entertain common law claims.

18        The Supreme Court has discussed small claims and their relationship with the

19  common law in the context of the Seventh Amendment.   <u>Hof</u>, 174 U.S. at 7-23.   The court

20  presents no novel theory on the matter.   "The justices of the peace who adjudicated small

21  claims disputes were not judges in common law courts.   For example, when Congress

**Civil No. 14-1101 (GAG)**

1    established small claims courts in the District of Columbia, the courts were not common law

2    courts subject to the Seventh Amendment." The Twenty Dollar Clause, 118 HARV. L. REV.

3    1665, 1675 (Mar. 2005) (discussing Hof, 174 U.S. at 17-18).  "[T]he states also recognized

4    that justices of the peace were not common law judges," and "the Seventh Amendment's

5    'common law' limitation would have preserved juryless small claims proceedings." Id.  The

6    Hof Court concluded: "A trial by jury . . . before a justice of the peace [over a small claim] .

7    . . can hardly have been within the contemplation of Congress in proposing, or of the people

8    in ratifying, the Seventh Amendment . . . ."  174 U.S. at 18.  Hof relied on the contours of

9    common law under English law, rather than American interpretation of English common

10   law: "[T]he Seventh Amendment . . . had in view the rules of the common law of England,

11   and not the rules of that law as modified by local statute or usage in any of the States."  Id.

12   at 7-8 (discussing U.S. v. Wonson, 1 Gallison 14, 20 (1812), for the proposition that English

13   common law is "the grand reservoir of all our jurisprudence").[9]

14       Professor Margreth Barrett investigated the relationship between common law and

15   small claims in England and the early colonial period.  See 39 HASTINGS L.J. 125 (1987).

---

[9] The Commonwealth ably and eloquently argues that Puerto Rico's civil system bore no resemblance to the English common law system of 1791, particularly with respect to civil jury trials, and that it would create confusion to attempt to establish boundaries as to what constitutes claims at common law.  (Docket No. 79.)  It posits that Puerto Rico merely exercises its interpretation of the common law, which the states did at the time of the founding.  While it is clear that the basic right to a civil jury trial for common law claims is fundamental, ascertaining the appropriate historical references by which to conclude that claims are ones arising "at common law" is a much closer question.  This is a valid concern, but Hof's directive to rely on English contours of common law claims rather than state, commonwealth, or territorial interpretations of the contours is controlling.  Furthermore, it establishes a base level of uniformity for cases in which litigants are entitled to civil jury trials, which is necessary since several states, commonwealths, and territories were either not a part of the United States or did not yet exist in the late eighteenth and early nineteenth centuries.

Civil No. 14-1101 (GAG)

1     The article discusses the history of small claims courts in English and American societies

2     and concludes that our Nation's history and tradition embrace juryless small claims courts.

3     Id. at 134-149.  "At the bottom of the hierarchy of English courts was a series of local,

4     inferior courts which focused primarily upon the resolution of small civil disputes . . . [two

5     types of which] provide historic precedent for modern juryless small claims procedures."

6     Id. at 134-35.

> 7  By the seventeenth century, many small monetary claimants
> 8  preferred to bring their suits in common-law courts.  While
> 9  litigants wished to avoid the local courts, however, bringing or
> 10  defending suits for small sums in the central common-law courts
> 11  was also unsatisfactory.  Such suits often entailed lengthy travel to
> 12  and from the court and invariably involved high litigation costs
> 13  that could not be justified . . . .  An increasingly strong demand
> 14  arose for courts to handle small claims – particularly small debts –
> 15  efficiently and inexpensively.  This demand led to the creation of
> 16  the "Court of Requests," or Small Debtor's Court, in London in
> 17  1519.  This court was created originally through an act of
> 18  Common Council . . . [and would proceed] without a jury [in]
> 19  cases of debt under forty shillings.  Parliament confirmed this act .
> 20  . .  through statutes in 1604 and 1605.  This London court was
> 21  extremely popular and heavily used.  Later in the seventeenth
> 22  century, and in the eighteenth and nineteenth centuries, similar
> 23  courts of request [sometimes classified as new county courts] were
> 24  created in most principal cities through special private acts of
> 25  Parliament.
> 26  [. . . .]
> 27  Rules of common law were respected to a certain extent . . .
> 28  . [and b]eginning in 1805 . . . Parliament began to broaden the
> 29  jurisdiction of [small claims courts] to include cases of assumpsit
> 30  and *insimul computasset*, *quantum meruit*, trover and conversion,
> 31  and trespass and *detinue* for goods or chattels taken or detained.
> 32  Also beginning in 1805, Parliament began to raise the
> 33  jurisdictional maximum amount-in-controversy . . . .  [and t]he
> 34  initial jurisdiction of the new county courts extended to all
> 35  personal actions where the debt or damage did not exceed twenty
> 36  pounds . . . .

38     Id. at 135-43 (citing, inter alia, 3 William Blackstone, COMMENTARIES *61-70).

**Civil No. 14-1101 (GAG)**

1    Hof agreed: "[I]n England . . . courts . . . whose proceedings varied in many respects

2    from the court of the common law . . . were empowered to hear and determine, in a summary

3    way, without a jury, personal actions [whose amount-in-controversy] did not exceed forty

4    shillings."  174 U.S. at 16-17.    The court reads this as meaning that the English embraced

5    juryless small claims courts and that claims before those courts did not constitute "[s]uits at

6    common law."  U.S. CONST. amend. VII.

7        This understanding crossed the Atlantic with the English citizens who colonized

8    America.  "[T]he settlers . . . were quick to establish special juryless tribunals for expeditious

9    determination of small monetary claims, generally of forty shillings."   39 HASTINGS L.J. at 145

10    (citing sources substantiating juryless small claims tribunals in Massachusetts, New York, and

11    New Jersey).  Ohio, the Northwest Territory, Virginia, Kentucky, Pennsylvania, and Connecticut

12    all provided for juryless small claims courts with varying amount-in-controversy requirements

13    around the time of the founding.  See id. at 147-49 (citing state, colonial, and territorial laws);

14    see also  The Twenty Dollar Clause, 118 HARV. L. REV. at 1675 (same regarding Pennsylvania).

15    Barrett explained:

16              While each colony's court system was unique, each nevertheless
17              followed the basic English pattern of maintaining separate
18              tribunals to handle specified categories of disputes, including
19              tribunals for expeditious handling of small monetary claims.  Civil
20              jurisdiction over small debts . . . usually was vested in justices of
21              the peace in the colonies.  Justice of the peace jurisdiction was
22              statutorily prescribed and limited to relatively small amounts-in-
23              controversy.   In most jurisdictions, justice of the peace courts
24              operated without a jury.
25
26    Id. at 146.
27
28        Barrett notes that "[s]ome colonies and territories apparently did provide a jury for every

**Civil No. 14-1101 (GAG)**

1   small debt claim, regardless of the amount involved." Id. at 149 & n.126. Specifically,

2   Tennessee refused to engage in the practice, and New York and Georgia compromised by

3   providing for a small jury in the justice of the peace court itself. Id. at 149 n.126; see also The

4   Twenty Dollar Clause, 118 HARV. L. REV. at 1675 (discussing Pennsylvania's change to

5   eliminate juryless small claims courts and distinguishing its constitution's broad reach from the

6   Seventh Amendment's limitation to suits at common law). Although these states provided for a

7   jury in small claims matters, history weighs in favor of holding that the early English and

8   American legal systems embraced juryless small claims courts, and precedent requires looking to

9   English authority for defining the scope of suits at common law. Hof, 174 U.S. at 7-8. States

10  may provide jury trials in small claims matters if they so wish, but the federal government

11  cannot require them to do so because small claims matters differ from claims "at common law"

12  and thus fall outside the purview of the Seventh Amendment. Id. at 18.

13  **IV.    Conclusion**

14          In sum, the Seventh Amendment is incorporated within the states, commonwealths, and

15  territories of the United States. This court is asked to expand McDonald outside the scope of the

16  Second Amendment. Ordinarily, this prerogative belongs to the Supreme Court.[10] However, as

17  discussed, McDonald called Bombolis to question for "long predat[ing] the era of selective

18  incorporation." Id. at 3035 n.13. Because the principal issue before the court is whether the

19  forum-selection clause is invalid due to the chosen forum's denial of the right to a civil jury trial,

---

[10]   See Hohn v. United States, 524 U.S. 236, 252-53 (1998); see also Rodriguez de Quijas v.
Shearson, 490 U.S. 477, 484 (1989) ("If a precedent of th[e] Court has direct application in a
case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals
should follow the case which directly controls, leaving to th[e] Court the prerogative of
overruling its own decisions.").

**Civil No. 14-1101 (GAG)**

1    the court must assess whether Puerto Rico litigants (Puerto Rican or from elsewhere) enjoy this

2    right.  Although <u>Rivera</u> squarely resolved this issue, its reliance solely on <u>Bombolis</u> and the

3    Supreme Court's subsequent decision in <u>McDonald</u> merit this second look.

4         The court does not stray from the holding in <u>Rivera</u> that forum-selection clauses directing

5    litigants to the Puerto Rico forum are valid and thus hopes that a reviewing court will not

6    construe this opinion as an effort by a lower court to avoid a directive of a circuit decision.  That

7    is not what the court intends.  But to ignore <u>McDonald</u>'s commentary on <u>Bombolis</u> when a

8    sacred right is at stake would be a dereliction of duty, particularly when it seems likely that the

9    right has been incorporated.[11]  Furthermore, the court's discussion of the circumstances under

10    which litigants are or are not entitled to civil jury trials is merely meant to provide guide posts

11    but should not be considered absolute or comprehensive.[12]

12         For the reasons stated herein, the court **GRANTS** the motion to dismiss at Docket

---

[11]  At bottom, it bears repeating that the Commonwealth may still encourage its litigants to consent to proceed with bench trials, and, indeed, termination agreements may include provisions calling only for bench trials or specifically waiving jury trial rights.

[12]  The Office of Courts Administration briefed the court on the practical ramifications of offering civil jury trials in Puerto Rico.  The court does not consider, nor should it, the practical concerns of guaranteeing a fundamental right.  However, it bears noting that it looks like the Commonwealth's judiciary has a solid foundation in place to provide for the right and is off to a good start, having in place an Office of Jury Service Administration that performs a variety of tasks and already accommodating jury trials in criminal cases.  (Docket No. 78-1 at 7-10.)  The Office of Courts Administration states that its judiciary presently has 50,000 active criminal cases and approximately 28,000 civil cases whose litigants may be entitled to a civil jury trial. (<u>See</u> Docket No. 78-1 at 10.) These figures are illusory because they comprise the number of cases, not the number of trials, that the judiciary currently entertains.  Settlements and judgments as a matter of law in civil cases and plea bargains and dismissals in criminal cases stand between the Commonwealth and approximately 78,000 jury trials, and this number should drastically decline by the time the proceedings reach the trial stage.  While the court understands that this process will place an additional financial expense on the Commonwealth, this burden pales in comparison to the denial of a fundamental right.

**Civil No. 14-1101 (GAG)**

1  No. 36, holding that the forum-selection clause is valid and that the Seventh Amendment

2  right to a civil jury trial applies within the states, commonwealths, and territories of the

3  United States.  This case is **DISMISSED without prejudice**.[13]


**SO ORDERED.**

In San Juan, Puerto Rico this 25th day of June 2014.


*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge

---

[13] The court shall retain jurisdiction to enforce its judgment to the extent it becomes necessary.